**DAVID ABRAMS, ESQ.**
**Attorney at Law**
**305 Broadway 14th Floor**
**New York, New York 10007**
**212-897-5821**
UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------------------------------X
NASEEM SOFIA,

        Plaintiff,

    -against-

THE MEDICINES COMPANY, CLIVE
MEANWELL, SIMONA SKERJANEC,
PAUL ANTINORI, GARY DICKINSON,
FRANK GOODMAN, JENNIFER HANSON,
MARY BAUGH and KIM CARROLL,
individually and in their official capacities;
jointly, severally, and/or in the alternative,

        Defendants.

------------------------------------------------------------X

Civil Action No.

06 -2221(JAP)

RECEIVED--CLERK
U.S. DISTRICT COURT
2006 MAY 16   A 10: 00

## COMPLAINT AND DEMAND FOR JURY

    Plaintiff, NASEEM SOFIA (hereinafter referred to as "Sofia") by her attorneys,

Burstein & Blum LLP, as and for her complaint against the defendants, The Medicines

Company (hereinafter referred to as "TMC" or the "Company"), Clive Meanwell,

Simona Skerjanec, Paul Antinori, Gary Dickinson, Frank Goodman, Jennifer Hanson,

Mary Baugh and Kim Carroll (collectively, the "Individual Defendants") (TMC and the

Individual Defendants are collectively referred to as "Defendants"), hereby alleges as

follows:

    1.    This action seeks monetary damages, to redress defendants' unlawful

employment practices, including unlawful discrimination and retaliation against the

plaintiff in violation of Title VII of the 1964 Civil Rights Act. of 42 U.S.C. § 2000 e, the New Jersey Law Against Discrimination ("NJLAD") and the New Jersey Conscientious Employee Protection Act.

2.      Plaintiff, a Moslem female non-Caucasian employee of Saudi and Burmese national origin employed by TMC, has been confronted with a discriminatory barrier to equal opportunity advancement which has included the unlawful denial of promotions, compensation commensurate with male employees and other Caucasian female employees, and equality with respect to the terms and conditions of her employment.

3.      The plaintiff, as a Moslem female non-Caucasian employee of Saudi and Burmese national origin working for TMC, has been openly treated with hostility and denied equal terms and conditions of employment at TMC.

4.      To the extent that they even exist, TMC's written and unwritten policies and practices concerning assignments, evaluation, compensation and promotion are not applied uniformly or fairly, and unlawfully subjected plaintiff to a pervasive pattern of ongoing and continuing disparate treatment.

5.      In addition, TMC's policies and practices, or the lack thereof, have had and continue to have a disparate discriminatory impact on the plaintiff.

6.      In addition, the facts, as they will be set forth, give rise to a cause of action for discrimination by TMC on the basis of gender, or to otherwise create a hostile work environment at TMC for non-Caucasian women, as in the case of the plaintiff, who was subjected to sexual harassment by her co-workers and superiors.

7.      Furthermore, the facts, as they will be set forth, will demonstrate that

2

the defendants retaliated against the plaintiff when the plaintiff raised questions that
certain trials in the defendants' ACUITY PROGRAM failed to conform to the
regulations of the United States Food and Drug Administration ("USFDA"), which is
the federal regulatory body charged with oversight of the safety of certain
pharmaceutical drugs being issued to the consumer public.

8.      In sum, TMC discriminates against the plaintiff by advancing Caucasian
employees more quickly, into preferred departments, and to higher levels than the
plaintiff, as a Moslem female non-Caucasian employee, by denying the plaintiff equal
job assignments, promotions, and compensation, and by retaliating against the plaintiff
when she opposed these discriminatory practices and raised questions concerning the
hostile work environment, sexual harassment and the validity of trials conducted for
the approval of pharmaceutical drugs by the USFDA.

### JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331
and 1367, as this action involves federal questions regarding the deprivation of plaintiff's
civil rights under the laws of the United States, specifically the Title VII of the Civil

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a
substantial part of the events or omissions giving rise to this action, including the
unlawful employment practices alleged herein, occurred in this district.

### ADMINISTRATIVE PROCEDURES

11.     On November 10, 2005, the plaintiff filed a timely charge of
discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging

3

violations of Title VII, 42 U.S.C. §§ 2000e et seq. The charges filed with the EEOC arise out of the same facts alleged herein.

12.     On May 8, 2006, the EEOC issued its Dismissal and Notice of Rights determination including the "right to sue" to the plaintiff.

## PARTIES

### Plaintiff

13.     Plaintiff Sofia is a 36 year old dark skinned Moslem Saudi national female, who has been employed by the The Medicines Company (The Company) since February of 2002.

14.     Sofia resides in North Plainfield, New Jersey.

15.     Sofia is currently employed as a Senior Project Manager-In House Clinical Research Associate for TMC. Sofia was demoted to this position in November, 2004

16.     Sofia was previously employed until November, 2004 as Associate Director for Product Development with the Operating Room Surgery Team/Endovascular Team TMC.

17.     As shown herein below, Sofia is currently out on disability due to the events and/or omissions as alleged in this complaint. Sofia has been employed by TMC since February, 2002.

18.     Over the past 16 years, Sofia has been employed in health related industries culminating in her extensive background and experience in the pharmaceutical industry.

19.     Sofia has continued to increase both her responsibilities and her job positions with her employers as a result of the respect given to Sofia for her professional capabilities in the highly technical and demanding pharmaceutical industry.

20.     Prior to her employment with TMC, Sofia was employed by Analytikem located in Cherry Hill, New Jersey from 1990 to 1991 as an Organic Chemist involved in mass and gas spectrometry. Her work involved the analysis, gathering, generating and presenting of laboratory data predominately for pesticides, PCB's and herbicides for the New Jersey Environmental Protection Agency and private chemical industries.

21.     From 1992 to 1993, Sofia was employed by West Jersey Hospital in Voorhees, New Jersey as a Laboratory Technician responsible predominately for chemistry and hematology, including venipuncture, IV's, arterial blood gases for patients from neo-natal through geriatric care.

22.     From 1994 to 1997, Sofia was the Regional Trials Director for Advanced Clinical Research Microbiology in Boise, Idaho, where she was responsible for the management of 11 employees. Her duties included the training of all employees in conformity with Federal Regulations and "Good Clinical Practices"; marketing for new projects through current and established clients; Phase IIb-IV trials with14 pharmaceutical companies, clinical research organizations, and site management organizations and approximately 350 investigators. In therapeutic areas, Sofia worked in the fields concerned with Anti-Infective, Asthma/Allergy, OB/GYN, Pediatrics, Oncology, Endocrinology, Rheumatology and Gastro-Intestinal; preparing and negotiating budgets with clients (including implementing an incentive program for employees to account for all site specific budgets and delegation of monies), co-

monitoring for training, including Pre-Site through Close out Visits of clinical trials as well as regulatory documents, management and assisting and preparing sites for FDA audits; establishing organization specific training manual and standard operating procedure manual; designed protocol specific, source document and case report forms.

23.     From 1997 to 1998, Sofia served as the lead project manager for Schering-Plough Research Institute in Kenilworth, New Jersey for their Department of Oncology; assisted in designing all Phase I protocols, case report forms and database in investigational areas (with Pegelated Interferon and P54 Gene Therapy) in Renal Cell Carcinoma, Chronic Myeloid Leukemia and Solid Tumors, initiated and monitored sites in all 3 areas; launched 300 sites in 22 countries, and developed a worldwide program with the assistance of clinical research organizations in all 3 areas; wrote the phase IIb/III protocol for melanoma to be launched globally in 22 countries; prepared data and literature as established from pre-clinical and Phase I studies and draft protocols (for future phase II/III trials) for expert meetings, seminars and Investigator Meetings.

24.     From 1998 to 1999, Sofia was employed as a Manager for Novartis in East Hanover, New Jersey responsible for their Clinical Grants Administration; negotiation of Clinical Trial Agreements legal language, Master Agreements and budgets; worked with the therapeutic teams and PICAS administration to develop a grant specification worksheet, scheduling budget meetings, develop final cost breakdown and negotiation range; negotiated Clinical Trial Agreements.

25.     From 1999 to 2000, Sofia was employed in the Medical Affairs Department of Pfizer in New York City as Global Study Manager primarily in charge of the LIPITOR Global program (330 sites); then Rezulin (Phase IIIb-V); and Viagra

studies. She managed clinical research organizations including: Contract Grants

Administration, site selection and management: Negotiation of Clinical Trial Agreements

legal language, budgets, and protocol approvals for institutions, laboratories, outside

vendors and for related clinical research organizations; developed a new group to act as a

liaison between clinical study teams, marketing, contracts group, legal, and finance;

worked with the therapeutic teams (initiating a product launch, site selection accordingly

with Investigator Meetings), finance and CROCUS/ PICAS Administration to develop a

grant, scheduling budget meetings, protocol timelines, vendor specifications, preparing

and reviewing Request For Proposals (RFP) for clinical grants and protocols including

Investigator Initiated Studies; processed amendments to the contracts, budgetary

planning, protocols and business development for new drugs in conjunction with outside

vendors; worked with Biometrics and Data Management to ensure efficacy; coordinated

with Information Systems (IS) to develop a database and new software for a new groups.

26.     Sofia was thereafter employed by Bristol-Myers Squibb Pharmaceutical

Research Institute in Princeton, New Jersey from 2000 until her employment with the

defendant in 2002. Naseem Sofia was the Clinical Research Organizations

Manager/Clinical Scientist in the Department of Anti-Infectives (Oncology/HIV)Clinical

Discovery; assisted in designing and writing Phase I protocols, Case Report Forms and

database in investigational areas; team member for activities in Compassionate-use

Program for HIV launching 34 sites in the United States and Canada; established and

negotiated timelines/goals/budgets and contracts of current projects with the utilization of

clinical research organizations, vendors and consultants; performed quality assurance

audits of study management activities as well as quality assurance (QA) evaluations of

7

clinical research organizations; worked with team members in statistical and pharmacokinetic analysis of studies, communicating data consistent with the study protocol and any variations from the analysis plan as well as a liaison between the bio-analytical laboratory; in charge of all study drug/supplies.

27.     Although out on disability, Sofia has been employed by TMC from February, 2002 to the present.

28.     In February, 2002, Sofia had been hired by TMC as an Associate Director.

29.     At that time, Sofia's duties and responsibilities were working with the clinical research organizations, investigators and site personnel for implementing new Angiomax and Clevelox programs. Sofia reported directly to the Vice-President for Product Development. These duties and responsibilities continued until July 23, 2003, when the defendant Skerjanec was hired by the company as a Director of Clinical Operations. As a result, the defendant Skerjanec became Sofia's immediate supervisor.

30.     Sofia continued with TMC as Associate Director until November, 2004, when Naseem Sofia was forced to accept a demotion to the position of Senior Project Manager /In-house Clinical Research Associate under the threat of job termination.

31.     As stated above, her position with the company is currently Senior Project Manager /In-house Clinical Research Associate, which is a lower position than her previous position as Associate Director.

32.     Notwithstanding the demotion from Associate Director to Senior Project Manager /In-house Clinical Research Associate, Sofia's responsibilities continued to be equal to or even greater than her duties and responsibilities as an Associate Director.

33.     Sofia's responsibilities are Clinical Operations and Management for Angiomax and Clevelox  (coronary artery by-pass grafting (open heart) surgery/anti-hypertensive/pediatrics); assisting in products and business development; site selection in cardiac surgery and anesthesiology, designing and writing Phase IIb-III protocols; Electronic Case Report Forms and database in investigational areas of heart surgery, pediatrics and anesthesiology.

34.     Sofia had been working on a clinical trial entitled "ACUITY", which has involved 13,800 patients undergoing percutaneous coronary intervention, to demonstrate the superiority of TMC's product "Angiomax" to its primary competition "Heparan" in the field of coronary care.

35.     As part of the ACUITY program, Sofia has been charged with training approximately 25 newly hired consultants, site personnel and investigators across the United States on the method of conducting the trial and handling of patients.

36.     In addition, Sofia was the liaison between the consultants and the field representatives to insure the smooth operation of the ACUITY trials.

37.     Sofia was assigned responsibility for the enrollment of patients and the awarding of incentives to the sites for securing patients for the clinical trials.

38.     Sofia also is charged with establishing and negotiating timelines/goals/budgets and contracts for current projects with the utilization of clinical research organizations, vendors and consultants; preparing (Neonatal) Abstract, Poster and Study Reports submitted and presented at symposia in recruitment efforts for customers and educational purposes; preparing and presenting a new Business Plan for the Pediatric Market; preparing, marketing and recruiting experts in the pediatric field;

assisting in written request to the Food and Drug Administration for Pediatrics, Patent Extension applications for Angiomax; recruiting Advisory Board and preparing Investigator Meetings for new indication in Angiomax in Neonates/Pediatrics; preparing Marketing/Publishing material in liaison with the Communications department and Research and Development; implementing advocacy tools and relevant public awareness of Acute Coronary Syndrome/Thrombosis and DVT (Deep Vein Thrombosis), Heparin Induced Thrombocytotenia (HIT/HITTs Compassionate Use Expanded Access Program); in charge of design of ACUITY (13, 800 patients) enrollment tools and all materials; preparing and working with TMC's Regulatory Department to prepare regulatory document packages for Investigational New Drug Application filings; preparing company contracts ,budgets and standard operating procedures; compiling databases for trials; and completing company training for all employees in conformity with legal requirements and Food and Drug Administration regulations.

39.     Sofia was also charged with going out to multiple investigational sites throughout the United States upon the discharge of IHC (International Health Care Clinical Research Organization), to assess and review the issues with the ACUITY trial. All multiple regulatory concerns and issues with enrollments were documented and reported back to Clive Meanwell (Chief Executive Officer of TMC) and Simona Skerjanec (Director) and Mary Baugh (Director).

40.     Sofia is a citizen of the United States and at all relevant times met the definition of an "employee" of TMC under all applicable statutes.

<u>Defendants</u>

THE MEDICINES COMPANY ("TMC")

10

41.     The defendant TMC is a corporation organized and existing pursuant to the laws of the State of Delaware with its principal place of business at 8 Campus Drive, Parsippany New Jersey. At all relevant times, TMC met the definition of an "employer" under all applicable statutes.

42.     At all relevant times, TMC was the "employer" of Sofia under all applicable statutes.

### CLIVE MEANWELL ("Meanwell")

43.     Defendant, Clive Meanwell is a male TMC employee who, upon information and belief, resides at Bernardsville, New Jersey. Defendant Meanwell is the Chief Executive Officer of TMC. As Chief Executive Officer, defendant Meanwell was senior to Sofia within the corporate structure of TMC. At all relevant times, defendant Meanwell was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### PAUL ANTINORI ("Antinori")

44.     Defendant, Paul Antinori is a male TMC employee who, upon information and belief, resides at Basking Ridge, New Jersey. Defendant Antinori is the in-house General Counsel of TMC. As in-house General Counsel, defendant Antinori was senior to Sofia within the corporate structure of TMC.

45.     At all relevant times, defendant Antinori was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### GARY DICKINSON ("Dickinson")

46.     Defendant, Gary Dickinson, is a male TMC employee who, upon information and belief, resides at Princeton, New Jersey. Defendant Dickinson is the Vice President and Head of Human Resources of TMC. As Vice President and Head of Human Resources, defendant Dickinson was senior to Sofia within the corporate structure of TMC.

47.     At all relevant times, defendant Dickinson was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### FRANK GOODMAN ("Goodman")

48.     Defendant, Frank Goodman, is a male TMC employee who, upon information and belief, resides at Springfield, New Jersey. Defendant Goodman is the Vice President of Marketing and Business Development of TMC. As Vice President of Marketing and Business Development, defendant Goodman was senior to Sofia within the corporate structure of TMC.

49.     At all relevant times, defendant Goodman was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### SIMONA SKERJANEC ("Skerjanec")

50.     Simona Skerjanec is a female TMC employee who, upon information and belief, resides at New Jersey. Defendant Skerjanec is the plaintiff's superior as the Senior Director of TMC. As Senior Director, defendant Skerjanec was senior to Sofia within the corporate structure of TMC. At all relevant times, defendant Skerjanec was aware of and

directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### JENNIFER HANSON ("Hanson")

51.     Jennifer Hanson is a female TMC employee who, upon information and belief, resides at Plainsboro Township, New Jersey. Defendant Hanson is the Manager for Human Resources of TMC. As Manager for Human Resources, defendant Hanson was senior to Sofia within the corporate structure of TMC.

52.     At all relevant times, defendant Hanson was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### KIM CARROLL ("Carroll")

53.     Kim Carroll is a female TMC employee who, upon information and belief, resides in New Jersey. Defendant Carroll is the Business Unit Head IEM and the direct supervisor of the defendant Skerjanec. As Business Unit Head IEM of TMC, defendant Carroll was senior to Sofia within the corporate structure of TMC.

54.     At all relevant times, defendant Carroll was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

### MARY BAUGH ("Baugh")

55.     Mary Baugh is a female TMC employee who, upon information and belief, resides at Princeton, New Jersey. Defendant Baugh is a Director and the direct supervisor of the plaintiff. As a Director of TMC, defendant Baugh was senior to Sofia within the corporate structure of TMC.

13

56.     At all relevant times, defendant Baugh was aware of and directly participated in the discrimination, retaliation and otherwise unlawful employment decisions and actions taken against Sofia.

## STATEMENT

57.     Defendants have engaged in and are continuing to engage in a pervasive pattern and practice of discriminatory and retaliatory conduct targeted toward Sofia.

58.     Among defendants' discriminatory practices are: (1) failing to promote Sofia as rapidly and to as high a level as similarly situated men and Caucasian women; (2) discriminating against Sofia with respect to the terms and conditions of her employment, including denying Sofia equal job assignments and opportunities and support commensurate with similarly situated men and Caucasian women; (3) retaliating against Sofia when she complained of this discriminatory treatment and sexual harassment; (4) sexual harassment of Sofia by various superior employees of TMC; (5) race discrimination against Sofia based upon her race and color; (6) national origin discrimination based upon Sofia's origin as a Saudi; (6) hostile work environment; and (7) requiring Sofia to go outside of Food and Drug Administration guidelines in securing patient enrollment in TMC's ACUITY trials for USFDA approval.

59.     The pattern and practice of discrimination and other unlawful conduct alleged in this Complaint has been carried out at TMC  by its employees and agents acting within the scope of their employment and upon the authority, directions, instructions, encouragement, and/or with the knowledge, acquiescence and ratification of TMC and others.

60.     Through the actions described herein, TMC acted knowingly,

intentionally, maliciously, and/or with willful, wanton, and reckless disregard for the federally protected civil rights of the Plaintiff as well as causing and requiring the plaintiff to engage in extralegal activities concerning the ACUITY trials being run by the defendant.

## DISCRIMINATORY ACTS, SEXUAL HARASSMENT AND HOSTILE

## WORK ENVIRONMENT

61. Defendants' pattern and practice of discriminatory and retaliatory conduct toward Sofia is an outgrowth of the general discriminatory attitude towards women that pervades TMC.

62. In January, 2002, while being interviewed for the job by the defendant Dickinson, the Vice President/Head of Human Resources, Sofia was specifically asked:

"How could someone as attractive as you not be married? Why don't you have a ring on your finger?"

63. In July 2002, Sofia was harassed by a co-worker, Andrew Humenick while changing a water bottle at the water cooler. In the presence of defendant Dickinson, who was the Vice President/Head of Human Resources, the defendant Humenick stated aloud, "we're gonna have a wet t-shirt contest!" No action was taken by the defendant Dickinson with respect to the comment made in public to Sofia.

64. In September 2002, the defendant Dickinson's (Vice President/Head of Human Resources) bag accidentally made contact with Sofia. Rather than apologize or even ignore the contact, the defendant Dickinson stated to Sofia, "Good, I got to touch your bum." This comment was made in the presence of several male employees who laughed at the comment. No action was taken by TMC with respect to this comment made in public to Sofia.

65.    As these comments had been made by the defendant Dickinson, the Vice President/Head of Human Resources, Sofia deemed that it would have been futile to make any complaint and risk her employment with TMC.

66.    Over an eighteen month period from July 2002 until April 2004, the defendant Antinori, who is the General Counsel of TMC, made the following comments to Sofia in the presence of others:

"When are we going to get together/ when are we going out for dinner?"
"Naseem, you look so hot today"
"Naseem, God, I wish I wasn't married"
"Man, I'd like to fuck her" (in reference to a co-worker, Sonja Loar, no longer employed at TMC)

67.    The defendant Antinori also had the habit of telling inappropriate sexually explicit jokes to Sofia and other women in her presence.

68.    In early 2005, the defendant Goodman, the Vice President of Marketing and Business Development of TMC, stated to Sofia, after having learned about Sofia's planned vacation to the Caribbean:

"Don't get too black, you don't look good black!"

69.    The comment by the defendant Goodman to Sofia was made in front of an African American colleague, Nasiba Abdul-Karim, and Heidi Workman, a woman of Filipino origin with brown skin, and the defendant Antinori.

70.    From in and about 2003 until 2005, the defendant Goodman repeatedly asked Leisa Waynick, a black female co-worker,  to "go find out if Naseem's breasts are real" and discussed Sofia's breasts with her many times until she became uncomfortable and advised Sofia of these conversations.

16

71.     The defendant Goodman constantly touched and kissed Sofia without her

consent in the presence of Heidi Workman, a co-worker, and the defendant Antinori.

72.     On numerous occasions during the years 2003 and 2004, Sofia's

immediate supervisor, the defendant Skerjanec made the following unsolicited and

unwelcome comments to Naseem Sofia:

"Naseem, you've got a great body"
"You should come to my house when my husband's not there, it will be just me and you"
"I really want to go to bed with Greg Fiore, I know he's not gay and I bet he's got big muscles"
"You should leave your boyfriend, I would treat you much better"

73.     In or about April, 2004, Sofia was harassed by the defendant Skerjanec

while on a business trip in Snowmass, Colorado, when the defendant Skerjanec

approached Sofia in a hotel locker room, and while Skerjanec was completely naked,

Skerjanec made inappropriate comments about Sofia's body and breasts.

74.     During that work related business trip, after demanding Sofia's presence

in her hotel room under the guise of business, the defendant Skerjanec cornered Sofia,

removed her own shirt and groped Sofia's breast.

75.     Subsequent to the incident involving the defendant Skerjanec, and Sofia's

refusal to acquiesce to the defendant Skerjanec's inappropriate sexual demands, the

defendant Skerjanec began altering Sofia's work requirements, requiring more and more

administrative and clerical work and less technical biological research of the nature for

which Sofia was hired.

76.     In November 2004, Sofia was told by the defendants Skerjanec and

Dickinson that her position was redundant, and that TMC was going through redundancy

and was terminating people during that quarter. In point of fact, no one was terminated.

Sofia was advised by the defendants Skerjanec and Dickinson that she could either take severance or be demoted. Faced with severance, Sofia agreed to the demotion. In fact, the position formerly held by Sofia as well as the projects that Sofia had been working on was continued by TMC. The position was then filled by TMC with a Caucasian co-employee, Cynthia Shade, who Sofia had previously trained. .

77.    TMC sent out a mass email to its employees to refer new employees to the company, because they were planning on hiring 25 people during the first quarter of 2005. At the company end of year 2004 Christmas meeting held on December 17, 2004, management again asked the employees to refer candidates for employment with the promise of a $5000 dollar bonus to be given. There was never any announcement concerning a redundancy issue in the company

78.    Several months after Sofia was moved to a new position in TMC, the defendant Skerjanec was also transferred and again became Sofia's superior within the department. The defendant Skerjanec continued a pattern of harassment and degradation.

79.    From May 2004 through December 2004, Sofia reported to Michael Mitchell and Taunia Maukvakia, both TMC Directors and superior to Sofia, regarding the issues of sexual harassment and the hostile work environment caused by the defendant Skerjanec.

80.    In late 2004, Skerjanec cornered Sofia in the restroom and threatened to have her fired if she told anyone about the hotel incident in Snowmass, Colorado.

81.    These actions finally drove Sofia to lodge a formal complaint within TMC against the defendant Skerjanec, which included reference to the events in the Snowmass, Colorado hotel in 2004.

82.     The defendant TMC not only failed to adequately respond to her complaint, but Sofia was placed in an embarrassing position in which she was told by the defendant Skerjanec and the Human Resources Department to report directly to the defendant Skerjanec privately to have a new job evaluation performed.

83.     TMC failed to address the issue concerning the complaint of sexual harassment of Sofia by the defendant Skerjanec. Instead, TMC directed Sofia to have her job performance evaluated by the very supervisor who had sexually harassed the plaintiff.

84.     Prior to the filing of the complaint, all of Sofia's evaluations had been acceptable. Sofia had never received any verbal or written complaint or negative feedback by any colleague, supervisor or the Human Relations Department.

85.     Subsequent to her complaint concerning the discriminatory behavior experienced, Sofia was directed to receive a performance review by the defendant Skerjanec. This performance review and not been previously scheduled and had never been conducted by the defendant Skerjanec prior to Sofia's complaint. This was extremely peculiar and discomforting to Sofia, since the defendant Skerjanec was the subject of her complaint. The performance review was also performed by the defendants Hanson and Baugh.

86.     The plaintiff received a negative employee review from the defendants Skerjanec, Hanson, Carroll and Baugh without any justification.

87.     Sofia was specifically advised by the defendant Baugh that Baugh was told to play the "bad cop" concerning her employee review, which indicated that the negative review was not justified.

88.     By taking the unusual step of directing a separate performance review, as

well as falsifying or inflating performance problems, TMC has unlawfully retaliated against Sofia for asserting her claims of sexual harassment, hostile work environment and discrimination.

89.     No disciplinary action was ever taken against the defendant Skerjanec. In fact, upon information and belief, the defendant Skerjanec has been promoted within TMC.

90.     The defendant Skerjanec continued to harass Sofia until Sofia became physically ill as a result of work related stress and sought, and received medical treatment and disability payments.

91.     Sofia has been passed over for promotion, said position being given to Meredith Todd, a blonde haired blue eyed Caucasian woman who was less experienced and less qualified than Sofia for the program that Sofia had been working on.

92.     Upon information and belief, the defendant Meanwell stated to Rebecca Hollins, a co-worker of Sofia, as follows: "What does Naseem have to offer besides being pretty?"

93.     As a result of the actions and inactions of the defendants as described hereinabove, the plaintiff was caused to become physically distraught and sustained shock to her nervous system and suffered severe emotional distress and so remains and was obliged to and did expend and incur large sums of money for medical treatment, attendance and other medical aid and believes her injuries are permanent.

## RETALIATION FOR QUESTIONS CONCERNING ACUITY
## PHARMACEUTICAL TRIALS

94.     International Health Care Clinical Research Organization ("IHC") had been conducting the trials for TMC's ACUITY Program since 2003.

95.     IHC was fired on December 17, 2004 and TMC was forced to hire approximately 25 consultants on about two weeks' notice. TMC was obligated to provide these new consultants with a three day crash course before dispatching them to "monitor" the ACUITY trials.

96.     Sofia was designated as an "interface" with the new consultants together with the defendant Baugh.

97.     Sofia reported the "multiple issues" that IHC had directly to the defendants Meanwell, Skerjanec and Baugh.

98.     Among the issues or problems raised by Sofia to her supervisors was that the trial sites had not had a yearly visit by the sponsor/sponsor representative (in this case IHC) in over one year in some cases. As indicated by Sofia to her supervisors, the yearly visit is required at a minimum by "GOOD CLINICAL PRACTICES" (GCP's) to insure that these trial sites are legitimate and conducting their procedures in accordance with the prescribed guidelines. Sofia further reported that, in some cases, these trial sites had not even received a phone inquiry or study material and supplies to do the clinical trial adequately and as per USFDA guidelines.

99.     In some cases, the sites had also received the ANGIOMAX/study drug (in connection with the ACUITY PROGRAM) without any training and the drug was dispensed by inadequately trained personnel to patients involved in the study.

100.    Sofia also advised that the trial sites were not comfortable with the present organization and felt inadequately trained to continue participating in the trials.

21

101.    Upon information and belief, due to the fact that TMC wanted to complete the trials, TMC's management decided to have the sites continue to place patients on the trial and to concern themselves about training later on. In point of fact, most of the trial site representatives were not retrained or re-inserviced.

102.    Sofia further advised her supervisors, the defendants Meanwell, Skerjanec and Baugh that some trial sites reported that IHC representatives had conducted themselves in an unprofessional manner; appeared in a drunken condition; accompanied by personal companions; that the IHC representatives had inadequate training.

103.    Notwithstanding the issues and problems raised by Sofia with the defendants Meanwell, Skerjanec and Baugh, patients were continued to be enrolled in the ACUITY Program trials.

104.    Sofia reported that trial sites were not following the ACUITY study outline, because the representatives had not been trained even while continuing to enroll patients resulting in some of the data possibly being omitted in the final results

105.    Additionally, Sofia reported that there had not been any direct contact in many cases between the IHC representatives and TMC headquarters from the program inception until after January 2005. Upon discovering this lapse in the guidelines, Sofia repeatedly reported this problem at many corporate meetings, which included the senior employees of TMC.

106.    Additionally, Sofia objected when she noticed that consultants were given approval by the defendants Skerjanec, Meanwell and Baugh to give the trial sites unlimited incentives to enroll patients in the trials. Sofia ascertained that the incentives

provided to patient enrollees were in excess of several hundred dollars as opposed to the $75 per month guideline set by the USFDA,

107.    Sofia reported this violation of the USFDA guidelines to Martin Johannassen of TMC's Finance Department. Upon information and belief, Martin Johannassen advised the defendant Skerjanec of Sofia's objection to the excess incentive payments.

108.    From January 2005 until August, 2005, Sofia reported the same concerns about the ethics of the trials to her immediate supervisors, Christine Chansky and the defendant Baugh. Christine Chansky advised Sofia that she was powerless to do anything as she herself felt that the company was paying  the Investigator Gregg Stone, HEAD of the ACUITY program, unethically in the millions of dollars for work not rendered or justified and was demoted after she refused to sign paperwork to approve the payment for ACUITY.

109.    After communicating the objection to the violation of the USFDA guidelines, Sofia was suddenly removed from the ACUITY Program without any cause or justification. Martin Johannassen stated to Sofia that the action was taken by the defendant Skerjanec because Sofia was deemed to have been interfering with the enrollment of patients for the trials and TMC now had to withdraw all the extra money and gifts promised to the trial sites and investigators.

110.    By removing Sofia from the ACUITY Program, TMC effectively demoted Sofia to a lesser role and prevented her from further promotion within TMC as well as marginalizing her within the Company.

111.    TMC took these adverse actions against Sofia due to her insistence on

adhering to the USFDA regulations in performing the ACUITY trials.

## CAUSES OF ACTION

### COUNT ONE: VIOLATION OF TITLE VII

112.   The allegations contained in paragraphs 1 through 111 are incorporated as if restated herein.

113.   Defendant TMC'S actions and inactions have created a hostile work environment as defined by the courts construing Title VII.

114.   As a result of said hostile work environment, plaintiff has been denied promotion opportunities and otherwise suffered the effects of discrimination.

115.   Plaintiff specifically has been demoted to Senior Project Manager-In House Clinical Research Associate from the position of Associate Director for which she is and has been qualified since she first occupied said position in TMC.

116.   By so doing, the defendant TMC committed an unlawful practice in violation of Title VII.

117.   Plaintiff has lost back wages, including fringe benefits related thereto, and front wages in an amount to be determined at trial.

### COUNT TWO: VIOLATION OF TITLE VII

118.   The allegations contained in paragraphs 1 through 111 are incorporated as if restated herein.

119.   During the period of the plaintiff's employment by the defendant TMC, the defendant TMC discriminated against the plaintiff with respect to the terms, conditions and privileges of the plaintiff's employment, because of her race, sex, national origin and/or religion.

24

120.    As a result of said discrimination, plaintiff has been denied promotion opportunities and otherwise suffered the effects of discrimination on account of her race, sex, national origin and/or religion

121.    Plaintiff specifically has been demoted to the position of Senior Project Manager-In House Clinical Research Associate from a position of Associate Director for which she is and has been qualified since she first occupied said position in TMC.

122.    By so doing, the defendant TMC committed an unlawful practice in violation of Title VII.

123.    Plaintiff has lost back wages, including fringe benefits related thereto, and front wages in an amount according to proof to be offered herein.

### COUNT THREE: VIOLATION OF THE NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT

124.    The allegations contained in paragraphs 1 through 111 are incorporated as if restated herein.

125.    Supplemental jurisdiction is established pursuant to 28 U.S.C. §1367 as the claim forms part of the same case and controversy as the claims brought under the First and Second Counts.

126.    The defendant TMC's actions and inactions resulting in the failure to promote the plaintiff constitute retaliation in violation of the New Jersey Conscientious Employee Protection Act.

127.    Plaintiff has lost back wages, including fringe benefits related thereto, and front wages in an amount according to proof to be offered herein.

### COUNT FOUR: VIOLATION OF TITLE VII

128.    The allegations contained in paragraphs 1 through 111 are incorporated as if restated herein.

129.    Defendant TMC, in committing the above-described acts, intended to and did inflict severe emotional distress upon plaintiff. Defendants acted with a reckless disregard of the probability of causing emotional distress to plaintiff.

130.    As a result of the actions and inactions of the defendant TMC as described hereinabove, the plaintiff was caused to become physically distraught and sustained shock to her nervous system and suffered severe emotional distress and so remains and was obliged to and did expend and incur large sums of money for medical treatment, attendance and other medical aid and believes her injuries are permanent all to her damage in an amount to be determined at trial.

## COUNT FIVE: VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION

131.    The allegations contained in paragraphs 1 through 111 are incorporated as if restated herein.

132.    This cause of action arises under New Jersey Law Against Discrimination, N.J.S.A §10:5-1 *et seq.* Supplemental jurisdiction is established pursuant to 28 U.S.C. §1367 as the claim forms part of the same case and controversy as the claims brought under the First and Second Counts above stated.

133.    By discriminating against the plaintiff, a Moslem female Saudi employee, in the terms and conditions of employment, the defendants violated the New Jersey Law Against Discrimination, N.J.S.A. §10:5-1 *et seq*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against the Defendants -and grant the following relief:

A.     An award of damages in an amount to be determined at trial plus prejudgment interest to compensate plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

B.     An award of damages in an amount to be determined at trial plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

C.     An award of damages in an amount to be determined at trial plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

D.     An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial plus prejudgment interest;

E.     An award of punitive damages in an amount to be determined at trial;

F.     An award of costs that Plaintiff has incurred in this action, as well as her reasonable attorneys' fees to the fullest extent permitted by law; and

G.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a

trial by jury on all issues of fact and damages.


Dated: May 11, 2006                  Respectfully submitted,
New York, New York

 

_____

David Abrams (DA8126)